Case No. 23-3011

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BERNHARD JAKITS,

Defendant-Appellant.

---

On Appeal from the United States District Court for the Southern District of Ohio
Case No. 2:22-CR-00194, before the Honorable Judge Edmund A. Sargus, Jr.

---

**BRIEF OF APPELLANT BERNHARD JAKITS**

---

Respectfully submitted,

Tillman J. Finley
Daniel Marino
MARINO FINLEY LLP
818 Connecticut Avenue, N.W., Suite 801
Washington, DC  20006
(202) 223-8888

David H. Thomas
TAFT STETTINIUS & HOLLISTER LLP
41 South High Street, Suite 1800
Columbus, OH  43215-6106
(614) 221-2838

*Counsel for Appellant*

i

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................ i

TABLE OF AUTHORITIES .......................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................ vi

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE ........................................................2

   I.   Factual Background .......................................................2

   II.   Investigation by Ohio Authorities ...................................3

   III.   Investigation by Federal Authorities and Dialogue with Defense Counsel ..4

   IV.   The Indictment and Mr. Jakits' Prompt Surrender......................5

   V.   The Detention Hearing Before the Magistrate Judge..................6

   VI.   Mr. Jakits' Motion to Revoke Detention Order .........................10

SUMMARY OF THE ARGUMENT ....................................................14

ARGUMENT ...................................................................17

   I.   Standard of Review ......................................................17

   II.   The Bail Reform Act Establishes a Rebuttal Presumption—Not a Mandate—of Pretrial Detention in Cases Involving Certain Offenses ................17

   III.   The Government Did Not Prove by Clear and Convincing Evidence No Condition or Combination of Conditions Will Reasonably Assure the Safety of the Community ...................................................20

   IV.   The Government Did Not Prove by a Preponderance of the Evidence That No Condition or Combination of Conditions Will Reasonably Assure Mr. Jakits' Appearance as Required .......................................................27

      A.   The District Court Only Made One of the Two Findings Required to Justify Pretrial Detention ...................................................28

      B.   The Evidence in the Record Does Not Support the Finding Mr. Jakits Is a Flight Risk...............................................................30

      C.   Mr. Jakits Has No History of Evasion and He Has Demonstrated His Commitment to Appearing................................................33

      D.   Mr. Jakits Has Stable Ties to the United States ......................37

E.      The Modest Extent of Mr. Jakits' Assets Do Not Present a Flight Risk and Pale in Comparison to Cases Where Flight Risk Has Been Found ...........40

F.      Mr. Jakits' Past International Travel Is Not of the Type that Would Aid Flight of Any Kind ............................................................................................44

CONCLUSION .........................................................................................................46

CERTIFICATE OF COMPLIANCE .......................................................................47

CERTIFICATE OF SERVICE ................................................................................47

ADDENDUM: .........................................................................................................48

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*United States v. Baird*,
   No. 2:10-mj-0431, 2010 WL 2889086 (S.D. Ohio July 19, 2010) …………...32

*United States v. Blankenship*,
   No. 1:08-0073, 2008 WL 1925137 (S.D. W. Va. Apr. 29, 2008)…………….24

*United States v. Brown*,
   579 F.3d 672 (6th Cir. 2009) ……………………………………………...3

*United States v. Buchanan*,
   No. 1:21-cr-00293, 2021 WL 1783088 (N.D. Ohio May 5, 2021) …………...36

*United States v. Cammarata*,
   No. 21-00427-01, 2022 WL 428048 (E.D. Pa. Sept. 15, 2022) …………...36-37

*United States v. Crowell*,
   No. 06-M-1095, et al., 2006 WL 3541736 (W.D.N.Y. Dec. 7, 2006)……...20, 22

*United States v. Demmler*,
   523 F. Supp. 2d 677 (S.D. Ohio 2007) ……………………………………36

*United States v. Friedman*,
   837 F.2d 48 (2d Cir. 1988) ………………………………………………..31

*United States v. Garnett*,
   No. 1:07-CV-00093, 2007 WL 2446585 (S.D. Ohio Aug. 23, 2007) ..…….34-35

*United States v. Gibson*,
   384 F. Supp. 3d 955 (N.D. Ind. 2019) …………………………………...29-30

*United States v. Giordano*,
   370 F. Supp. 2d 1256 (S.D. Fla. 2005) ...…………………...30-31, 33, 34, 42, 44

*United States v. Godbole*,
   No. 1:12 CR 381-3, 2012 WL 3686228 (N.D. Ohio Aug. 24, 2012) …...29-30

*United States v. Hillie,*
    39 F.4th 674 (D.C. Cir. 2022) ...……………………………………………3

*United States v. Hinton,*
    113 F. App'x 76 (6th Cir. 2004) .……………………………………………18

*United States v. Jessup,*
    757 F.2d 378 (1st Cir. 1985) ...……………………………………………19

*United States v. Kaplowitz,*
    No. 14-20323-CR, 2014 WL 2155231 (S.D. Fla. May 22, 2014) ..………...34-35

*United States v. Moore,*
    No. 2:16-cr-170, 2020 WL 2128593 (S.D. Ohio May 5, 2020) ………………32

*United States v. Parrish,*
    No. 2:16-CR-243, 2017 WL 3142082 (S.D. Ohio July 24, 2017), *aff'd*, 942 F.3d
    289 (6th Cir. 2019) .………………………………………………………..3

*United States v. Pece,*
    No. 1:20-CR-186-1, 2020 WL 6263640 (S.D. Ohio Oct. 23, 2020) ..……...19, 22

*United States v. Perkins,*
    850 F.3d 1109 (9th Cir. 2017) ..……………………………………………3

*United States v. Reiner,*
    468 F. Supp. 2d 393 (E.D.N.Y. 2006)………………………………………24

*United States v. Runsdorf,*
    No. 22-8015-WM, 2022 WL 303548 (S.D. Fla. Jan. 24, 2022) ...28-29, 42-45, 46

*United States v. Sabhnani,*
    493 F.3d 63, 75 (2d Cir. 2007) ………………………………………..27, 29

*United States v. Salerno,*
    481 U.S. 739 (1987) .………………………………………………..17

*United States v. Sammons,*
    No. 2:19-cr-107, 2020 WL 613930 (S.D. Ohio Feb. 10, 2020)…………………23

iv

*United States v. Schenberger*,
   498 F. Supp. 2d 738 (D.N.J. 2007)……………………………………………..23-24

*United States v. Smith*,
   No. 1:21-cr-127-8, 2022 WL 3212355 (S.D. Ohio Aug. 9, 2022) ……………..18

*United States v. Stone*,
   608 F.3d 939 (6th Cir. 2010) ..…………………………………………17, 18, 19

*United States v. White*,
   No. 3:21-mj-04070, 2021 WL 2155441 (M.D. Tenn. May 27, 2021) ….35-36, 45

*United States v. Williams*,
   No. 2:20cr-142, 2020 WL 6866404 (S.D. Ohio Nov. 23, 2020) ………………32

## Statutes

18 U.S.C. § 875...……………………………………………………………………..1

18 U.S.C. § 2251 ...…………………………………………………..1, 4, 5-6, 18, 22

18 U.S.C. § 2252 …………………………………………………………..1, 4, 6, 18

18 U.S.C. § 2252A ..……………………………………………………………...4

18 U.S.C. § 2256 ...……………………………………………………………………3

18 U.S.C. § 2422 ……………………………………………………………1, 4, 5-6

18 U.S.C. § 3142 ...…………………………………17-18, 22, 27, 28, 30, 44

18 U.S.C. § 3145 …………………………………………………………………..1

18 U.S.C. § 3231 …………………………………………………………………..1

28 U.S.C. § 1291 …………………………………………………………………..1

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Defendant-Appellant Bernhard Jakits respectfully requests oral argument. Given the shifting purported justifications for Mr. Jakits' detention in the proceedings before the Magistrate Judge and the District Court, and the summary nature of the District Court's ultimate rulings against the backdrop of a record that involved substantial briefs and hearings on three different dates, the Defense submits that oral argument is likely to assist the Court in reaching a decision.

## JURISDICTIONAL STATEMENT

On October 11, 2022, a federal grand jury sitting in the Southern District of Ohio returned an eight-count indictment against Mr. Jakits alleging violations of 18 U.S.C. §§ 875(d), 2251(a), 2251(d), 2252(a)(2), and 2422(b).  (Indictment, R. 1, Page ID # 3-8.)  The District Court thus had subject matter jurisdiction pursuant to 18 U.S.C. § 3231.

On October 21, 2022, the United States Magistrate Judge ordered Mr. Jakits detained pending trial.  (Order of Detention Pending Trial, R. 27, Page ID # 66-68.)  On January 5, 2023, the District Court denied Mr. Jakits' Motion to Revoke Detention Order.  (Order, R. 41, Page ID # 426.)  On January 6, 2023, Mr. Jakits filed a timely Notice of Appeal from this Order.  (Notice of Appeal, R. 42, Page ID # 427-428.)

This Court, therefore, has jurisdiction over this appeal pursuant to the Bail Reform Act, 18 U.S.C. § 3145(c), and 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Mr. Jakits asserts that the District Court erred in subjecting Mr. Jakits to pretrial detention and refusing to revoke the detention order entered by the United States Magistrate Judge.

## STATEMENT OF THE CASE

### I.    Factual Background

This cases arises out of Mr. Jakits' electronic and telephone communications in November and December 2018 with an adult woman, A.M., and later, in January 2019, with her two teenage daughters, Jane Doe #1 and Jane Doe #2.  Mr. Jakits began communicating online with A.M. through skipthegames.com, an adult classifieds website for escort services and adults seeking sexual interactions.  A.M. and Mr. Jakits engaged in communications and activity of a sexual nature through smartphones and the internet, and Mr. Jakits sent her money through Western Union. At the time, Mr. Jakits was living alone in Annapolis, Maryland.  He and his life and business partner, Kate Christensen, had recently sold the sailing yacht brokerage business they owned together and Ms. Christensen had moved to her childhood home in San Luis Obispo, California following the death of her father.  Mr. Jakits remained in Annapolis to work a bit longer.

In January 2019, A.M.'s eldest daughter, Jane Doe #1, communicated with Mr. Jakits through a series of text message exchanges and phone calls using her mother's phone, her grandmother's phone, and later her own phone.  In discovery, the government has identified 27 digital photographs it believes Jane Doe #1 sent to Mr. Jakits.  The large majority of those photos depict persons who are fully clothed, wearing underwear, and/or not engaged in anything that could even arguably be

2

characterized as "sexually explicit conduct" under 18 U.S.C. § 2256(2)(A), as required to support the charges against Mr. Jakits.  None of these images depict sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse.  *See* 18 U.S.C. § 2256(2)(A)(i)-(iv).  Six images do show, at least in part, female genitals, and the government appears to premise its case on the contention that at least one of these six photos (a) rises to the level of "lascivious exhibition" of the genitals, (b) so depicts the genitals of a minor, and (c) was produced by Mr. Jakits or at his direction. Mr. Jakits disputes each of these contentions as to all six photos.[1]

## II.    Investigation by Ohio Authorities

By January 2019, A.M. was incarcerated in the Belmont County (Ohio) Jail. While in custody, she reported to the Belmont County Sheriff's Office that her daughters were communicating with Mr. Jakits.  Belmont County officials then

---

[1] This case involves an exceedingly small number of images and all of those images are, at best, at the outer margins of what one can even argue meets the statutory definition of "sexually explicit conduct." *See, e.g.*, *United States v. Brown*, 579 F.3d 672, 681-82 (6th Cir. 2009) (holding display of nude genitals and/or pubic area is not alone sufficient to satisfy "lascivious" requirement); *United States v. Parrish*, No. 2:16-CR-243, 2017 WL 3142082, at *3 (S.D. Ohio July 24, 2017) (noting videos focused on minor's clothed pubic area "were not pornographic"), *aff'd*, 942 F.3d 289 (6th Cir. 2019); *see also United States v. Hillie*, 39 F.4th 674, 686 (D.C. Cir. 2022) (holding surreptitiously-recorded videos of minors in bedroom/bathroom capturing full nudity and showing genitals and pubic area did not rise to level of "lascivious exhibition" as a matter of law); *United States v. Perkins*, 850 F.3d 1109, 1114, 1121-22 (9th Cir. 2017) (holding nude "selfie" of minor sitting on bed "completely nude" and who "can be seen in the image from her upper thigh area to the top of her forehead" with breasts and genital area "clearly visible" did not depict "sexually explicit conduct" as a matter of law).

3

interviewed Jane Doe #1 and Jane Doe #2 on January 22, 2019. Belmont County authorities ultimately did not bring any charges against Mr. Jakits.

## III.    Investigation by Federal Authorities and Dialogue with Defense Counsel

On January 14, 2020—nearly a year after it interviewed A.M., Jane Doe #1 and Jane Doe #2—the Belmont County Sheriff's Office provided the products of its investigation to the FBI. Almost a year after that, on December 10, 2020, the FBI executed search warrants for Mr. Jakits' Maryland residence, his Apple iCloud accounts, and his person. Agents met Mr. Jakits at Los Angeles International Airport and seized various phones and computer devices from him. Pursuant to a subsequent search warrant, agents searched all of the phones, tablets, computers, and storage devices seized from Mr. Jakits and his home. The applications for each of those search warrants identify various statutes allegedly violated, including 18 U.S.C. §§ 2251, 2251(a), 2251(d), 2252, 2252A, and 2422(b). Mr. Jakits was not arrested or taken into custody. Mr. Jakits promptly engaged counsel, and shortly after the warrants were executed Daniel Marino contacted both the agent and AUSA Heather Hill. (*See* Transcript, R. 29 at Page ID # 92 [23:6-22].)

Over the following 22 months, the government and defense counsel communicated and exchanged information regarding the matter. The government provided defense counsel with discovery in November 2021, and defense counsel provided certain submissions and information to the government in an effort to

4

resolve the matter. Throughout this nearly two-year period of dialogue, the government was consistent and clear that, if an agreed resolution was not reached, it intended to seek indictment on charges that carried high statutory minimums, including, at a minimum, charges of production of child pornography (15-year statutory minimum) and coercion/enticement of a minor (10-year statutory minimum). (*See* Transcript, R. 29 at Page ID # 94 [25:2-9].)

During this time, Mr. Jakits engaged in no misconduct and made no attempt to flee.

## IV.    The Indictment and Mr. Jakits' Prompt Surrender

On October 11, 2022, a grand jury returned an indictment against Mr. Jakits charging him with seven child pornography offenses relating to his interactions with Jane Doe #1 and Jane Doe #2 and an eighth count purporting to charge an interstate communication with intent to extort involving earlier communications with A.M. (Indictment, R. 1, Page ID # 3-8.) The child pornography-related charges are the same ones identified in the 2020 search warrants, specifically three counts of production or attempted production of child pornography in violation of 18 U.S.C. § 2251(a); two counts of coercion or enticement and/or attempted coercion or enticement of a minor to engage in "any sexual activity for which any person can be charged with a criminal offense, including 18 U.S.C. § 2251(a)" in violation of 18 U.S.C. § 2422(b); one count of making and publishing "notices seeking participation

in any act of sexually explicit conduct by any minor for the purpose of producing a visual depiction" in violation of 18 U.S.C. § 2251(d); and one count of receipt of a visual depiction of a minor "engaged in sexually explicit conduct" in violation of 18 U.S.C. § 2252(a)(2).

The following day, Mr. Jakits was informed an indictment had been returned, and he promptly made arrangements to travel from the West Coast to Columbus, Ohio, where he surrendered himself on the morning of October 14, 2022.  He was taken into custody and a detention hearing was scheduled for October 19, 2022.

## V.    The Detention Hearing Before the Magistrate Judge

On October 19, 2022, the Magistrate Judge began a detention hearing.  The Pretrial Services Officer recommended that Mr. Jakits be released on a $500,000 bond subject to certain conditions, including that he surrender his passport, that his travel be restricted to the Southern District of Ohio and the Central District of California, and that he be subject to GPS and computer monitoring.  (Revised Pretrial Services Report, R. 20, Page ID # 50-51.)   The Defense submitted a declaration from Mr. Jakits' life partner, Ms. Christensen, recounting the history of their 22-year personal and business relationship; attesting to Mr. Jakits' ties to herself, his daughter and two granddaughters, his ex-wife, and various members of both of their extended families; and the lack of any indication by or desire on the part of Mr. Jakits to flee prosecution.  (Declaration of K. Christensen, R. 37-4, Page

ID # 329-333.)  Defense counsel argued "this was a very, very isolated incident in a very short chapter of Mr. Jakits' existence" (Transcript, R. 29, Page ID # 94 [25:23-25]) and the government acknowledged "there is no additional evidence of any other offenses against minors" (*id.* at Page ID # 86 [17:8-9]).  The government, however, nevertheless sought to have Mr. Jakits detained both as a danger and flight risk.

The Magistrate Judge readily (and correctly) found Mr. Jakits was not a danger to the community.  (Transcript, R. 29, Page ID # 101-102 [32:9 – 33:13].)  She agreed "this is a unique case" because there is not "a history by [the] charged individual of continually seeking out minor victims"; instead, "it does appear that the charged offenses involving minor victims was perhaps just a situation where the defendant had an opportunity, and … [he] does not have, necessarily, a history of targeting and exploiting minors."  (*Id.* at Page ID # 101 [32:9-18].)

The Magistrate Judge hesitated, however, on the question of whether Mr. Jakits presented a flight risk and ultimately suspended the hearing so that the government could provide her with certain evidence from the case and so that the Pretrial Services Officer could reach out to Ms. Christensen and ask her to testify by video conference.  The detention hearing resumed on October 21, 2022, Ms. Christensen testified by video, and counsel presented argument.  The government then argued that because he has a boat and financial resources (or at least more than "most defendants") and is facing "15- to 30-year sentences on at least four of the

counts in the indictment," "there isn't enough of a basis for Ms. Christensen to be able to be confident in her statement that he's not going to flee." (Transcript, R. 29, Page ID # 115-116 [46:16 – 47:25].)

Defense counsel noted the government had not asked Ms. Christensen about any of the things it claimed were not clear regarding the boat and where Mr. Jakits was living. The boat was in Seattle, but Mr. Jakits had been living in San Luis Obispo until "this past summer." There was nothing unclear about that, except the obvious error in the Pretrial Services Report that had said Mr. Jakits had been living on the boat for three and a half *years* as opposed to three and a half *months*. (Transcript, R. 29 at Page ID # 118 [49:2-17].) Defense counsel also reiterated there never was a doubt Mr. Jakits was going to be charged and what the charges were going to be, and he has known that since December 2020. For the same period of time, he has had a boat and has had the same financial capability. Yet he has stayed and done everything that's been asked of him, including getting on a red-eye flight from California to surrender himself in Columbus. (*Id.* at Page ID # 117 [48:6-25].)

Defense counsel further pointed out how cooperative and transparent Mr. Jakits had been. He had brought all of his electronics with him to Columbus and he offered them to the government to inspect, without counsel first reviewing any of it. (Transcript, R. 29 at Page ID # 97, 118-119 [28:16-21, 49:18 – 50:9].)

After a brief recess, the Magistrate Judge stated that Mr. Jakits had overcome

the presumption, but that she and her law clerks had done "a fair amount of research in cases where a defendant has the means to travel" and that courts consider that "a very serious factor" and that "when someone has this knowledge and this access to a particular vessel, or just a community that has access to these vessels, that weighs very heavily in favor of detention." (Transcript, R. 29, Page ID # 122-123 [53:22 – 54:9].)  The Magistrate Judge also noted Mr. Jakits' financial resources and his experience travelling internationally. (*Id.* at Page ID # 123-124 [54:18 – 55:7].) Finally, she stated that Mr. Jakits and Ms. Christensen's relationship "has been affected by these charges and, even before the charges were filed, by this investigation" (*id.* at Page ID # 125 [56:10-12]) and that it is "not that strong of an anchor for Mr. Jakits to not flee" and that his positive relationships with his daughter and grandchildren also would not "be enough for Mr. Jakits not to flee." (*Id.* at Page ID # 125-126 [56:23 – 57:7].)

Later that same day, the Magistrate Judge issued an Order of Detention Pending Trial. (Order of Detention Pending Trial, R. 27, Page ID # 66-68.)  The reasons given in the written order were the weight of the evidence, that he is subject to a lengthy period of incarceration if convicted, lack of a stable residence, that he "has significant financial resources," that he "is an avid sailor with access to his own vessel and potentially others," that he "has travelled extensively for business and pleasure (to 48 countries)," that he "does not have relationships that would heavily

9

discourage him from fleeing," and "the weight of the evidence suggests that he has been living on a sailboat off the coast of Seattle." (*Id.* at Page ID # 67-68.)

## VI.    Mr. Jakits' Motion to Revoke Detention Order

On December 16, 2022, Mr. Jakits filed a motion asking the District Court to revoke the Magistrate Judge's Order of Detention. (Defendant's Motion to Revoke Detention Order, R. 37, Page ID # 224-277.) Mr. Jakits' motion challenged the Magistrate Judge's unsupported conclusion that no condition or combination of conditions would reasonably assure his appearance and asked the District Court to release him on the conditions proposed by Pretrial Services, albeit with a lower bond amount that Mr. Jakits could afford without imperiling his ability to pay counsel.

The District Court set a hearing on the motion for January 5, 2023. On January 3, 2023, the government filed an opposition brief. (Government's Opposition to Defendant's Motion to Revoke Detention Order, R. 39, Page ID # 372-399.) In its Opposition, the government argued, among other things, that Mr. Jakits should be detained as a danger to the community based upon evidence of instances where Mr. Jakits had interacted online with adult women and possessed videos of women engaged in acts of bestiality with dogs.

On January 5, 2023, the District Court held a hearing and both sides presented argument and evidence. At the hearing, counsel for Mr. Jakits advised the District Court that, to address the bond issue and allay any concerns that Mr. Jakits would

flee, his daughter, Ms. Merrill, and her husband had agreed to post their own home in California as security.  (Transcript, R. 43, Page ID # 446 [18:4-24].)

For its part, the government called the lead case agent, Andrew McCabe, to testify.  Special Agent McCabe described certain videos found on Mr. Jakits' computers and/or in his Apple iCloud account which Agent McCabe described as depicting a woman engaged in sex acts with dogs.  (Transcript, R. 43, Page ID # 462-466 [34:18 – 38:24].)  Special Agent McCabe testified that A.M. (the adult woman who is the alleged victim of the extortion alleged in Count 8) appeared in some of the videos, and that she told him in an interview that "during her video chats with Mr. Jakits, that he would ask her to do degrading things; and that when she stated she didn't want to do them, he threatened to expose images and videos of her to her family."  (*Id.* at Page ID # 478 [50:2-7].)  Special Agent McCabe also stated that, in one of the videos, A.M. was crying and "appeared to be in distress" and Mr. Jakits "appeared to be indifferent."  (*Id.* at Page ID # 466. 468 [38:10-15, 40:14-19].)

On cross-examination, Special Agent McCabe confirmed that in all of the searches and extractions the government had done of Mr. Jakits' various devices and accounts, they had not found any other materials relating to contact with or interest in minors.  (Transcript, R. 43, Page ID # 470, 483-484 [42:10-23, 55:3 – 56:1].)

11

Following argument by counsel, the District Court announced a decision to detain Mr. Jakits pending trial *both* as a danger to the community and a flight risk.

As to danger, the District Court explained that "I start with the charged conduct," stating its view that the child pornography offenses are "a very serious matter that did expose two minors to grave risk of harm" and that "in the last count of the indictment there is some sordid conduct that is alleged to be extortion of the mother of the minors, and the Court also views that as something extremely serious." (Transcript, R. 43, Page ID # 534 [106:2, 106:17-24].) The District Court then stated "[t]he government's not required to go any further than just make the argument that this criminal conduct was very serious, the public's at risk." (*Id.* at Page ID # 535 [107:3-5].) According to the District Court, "the dangerousness to the community seems to me to be established by what the government has offered and also the indictment itself." (*Id.* at Page ID # 535 [107:21-23].)

The District Court acknowledged there was no evidence of any other conduct of this nature by Mr. Jakits either before or since, but joined in the government's speculation (unsupported by any actual evidence) that there might be such evidence on some other device not obtained or searched by the government and/or such misconduct might have been engaged in by means not involving internet or phone communications. (Transcript, R. 43, Page ID # 535 [107:6-20].) The District Court then stated "[t]he fact that there is not other conduct that's been discovered here, in

12

the Court's mind in this particular type of case, doesn't indicate to the Court that that's -- that the dangerousness aspect has been negated." (*Id.* at Page ID # 535-536 [107:24 – 108:2].)

With respect to flight, the District Court noted that it found this "a little less compelling," but nevertheless stated "I do find a risk of flight" explained as follows:

> We have a lot of foreign travel. We have a person who is 71, who is facing a 15-year mandatory minimum in a number of counts.
>
> The issue of the boat I've already discussed in argument. I don't put much weight on that.
>
> But I do believe that someone who has traveled to 48 countries -- there are some restrictions, and it's not easy to travel to countries these days, that's true. But there are a few countries still that are, if anybody is dogged enough to find them, and there are ways to conceal people. We've had experience with that in the court here over the years.
>
> So I find this is not as compelling a factor, as I mentioned, as the dangerousness issue. But I think between the assets the defendant has, the extensive foreign travel, the age and the mandatory minimum involved in this case, that there is a risk of flight.

(Transcript, R. 43, Page ID # 536 [108:8-23].)

Shortly after the hearing concluded, the District Court issued a written Order stating that "[f]or the reasons discussed at the hearing," Mr. Jakits' motion was denied. (Order, R. 41, Page ID # 426.) Mr. Jakits filed the instant Notice of Appeal the following day.

13

## SUMMARY OF THE ARGUMENT

Bernhard Jakits is a 71-year-old, semi-retired man with no meaningful criminal history, a record of steady employment and work over the course of two careers (first as an aerospace engineer and later as a sailing yacht broker), and a life's worth of close, stable family, personal and professional relationships, including with his life partner of 20 years, his 37-year-old daughter, his two grandchildren, and many others. An October 11, 2022 indictment charges Mr. Jakits with seven counts of child pornography-related offenses arising out of his January 2019 electronic communications with two teenage girls, and an earlier alleged extortion threat against their mother. There are numerous problems with these charges, and Mr. Jakits intends to defend himself vigorously at trial.

Based on all of the information and circumstances, the Pretrial Services Office recommended Mr. Jakits be released pending trial on a surety bond and other conditions. (Revised Pretrial Services Report, R. 20, Page ID # 47.) The government has nonetheless sought to have Mr. Jakits detained both as a danger to the community and as a flight risk. But it has not meet its burden of proof on either front. There is no evidence of any other offense or conduct by Mr. Jakits involving or directed at minors (either before or since), and extensive searches of his home, person, accounts, and devices revealed no collection of child pornography or any other evidence of an interest in sexual material relating to children or sexual

14

interactions or communications with anyone other than adults.  Accordingly, the Magistrate Judge readily concluded Mr. Jakits poses no danger to the community, and he does not.

The District Court, however, disagreed, but based on the flawed premise that because the charges themselves are serious, the government is required to go no further than that to establish "the public's at risk."  This analysis is incorrect, and it would turn the rebuttable presumption adopted by Congress into a mandate it was never intended to be.  Further, there is no evidence—much less clear and convincing evidence—that Mr. Jakits currently presents a danger to the community.

Nor is Mr. Jakits a flight risk.  While the investigation and charges that bring him before this Court understandably have created some stress on his personal relationships, he nonetheless maintains stable ties to his life partner, daughter, and grandchildren (all of whom are in the Central District of California) and they all stand willing and able to support him as this case proceeds.  In fact, Mr. Jakits has every intention of doing everything that is asked of him by counsel, the Court, or Pretrial Services.  He has demonstrated his commitment by doing exactly that over the past two years that he has known about this investigation and these charges, including by voluntarily getting on a red-eye flight from the West Coast to appear and surrender himself once he learned he had been indicted.

Further, the law is clear that the mere fact of the seriousness of charges and potential penalties, the potential means (financial or otherwise) to flee, and past international travel are not enough to justify pretrial detention as a flight risk. Here, while the charges are undoubtedly serious, Mr. Jakits does not even have the means to make a realistic attempt at flight even if he were so inclined (which he is not). Mr. Jakits has some assets, but he is not wealthy. In fact, under the present circumstances, he cannot even afford the $500,000 surety bond the Pretrial Services Officer recommended. While he has traveled internationally for personal and business purposes many times, Mr. Jakits owns no foreign property, has no foreign assets or accounts, and has no foreign contacts or experiences that could help him live abroad as a fugitive.

Mr. Jakits has now been detained for three months, since he surrendered himself on October 14. The original trial date, December 19, 2022, was continued until February 27, 2023. He is currently detained at a state prison in Northwest Ohio, a two hour flight plus a nearly two-hour drive from his lead counsel. In the facility where he is presently housed, he is not able to review any of the evidence with his attorneys to assist in preparing his defense. Accordingly, his continued pretrial detention is not only unsupported legally or factually, but it is also actively interfering with his ability to defend himself and work meaningfully with counsel in preparing for trial. Because the government has not established by clear and

16

convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community, or by a preponderance of the evidence that no condition or combination of conditions will reasonably assure his appearance as required, this Court should reverse the District Court's detention order and order Mr. Jakits released on conditions pending trial.

## ARGUMENT

### I.    Standard of Review

In reviewing a district court's detention or release of a defendant pending trial, this Court reviews the District Court's factual findings for clear error but it reviews any mixed questions of law and fact and the ultimate question whether detention is warranted *de novo*.  *United States v. Stone*, 608 F.3d 939, 944 (6th Cir. 2010).

### II.    The Bail Reform Act Establishes a Rebuttal Presumption—Not a Mandate—of Pretrial Detention in Cases Involving Certain Offenses

Ordinarily, "[t]he default position of the law ... is that a defendant should be released pending trial." *Stone*, 608 F.3d at 945.  "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Indeed, the Bail Reform Act of 1984 creates a presumption that a defendant facing federal charges will be released pending trial.  18 U.S.C. § 3142(b).  However, "[t]hat default is modified ... for certain, *particularly dangerous* defendants." *Stone*, 608 F.3d at 945 (emphasis added).  Specifically, where a defendant is charged with one of the offenses listed in

17

18 U.S.C. § 3142(e)(3)(E), there arises a "rebuttable presumption" that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3). This rebuttable presumption is triggered in this case because the first seven counts of the indictment charge offenses involving a minor victim under sections 2251, 2252(a)(2), and 2422. 18 U.S.C. § 3142(e)(3)(E). Count 8 does not implicate the presumption.

To overcome the rebuttable presumption, a defendant must produce evidence that he is neither a danger to the community nor a risk of flight. *United States v. Smith*, No. 1:21-cr-127-8, 2022 WL 3212355, at *2 (S.D. Ohio Aug. 9, 2022). Although this burden of production is not heavy, a defendant must introduce at least some evidence. *Id.* (quoting *Stone*, 608 F.3d at 945). Here, the Magistrate Judge and the District Judge both correctly found Mr. Jakits met this burden of production.

If a defendant satisfies his burden of production, as Mr. Jakits did, the burden of persuasion on the ultimate issue of detention shifts back to the government. *Stone*, 608 F.3d at 945. As this Court has stated, "the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community." *Stone*, 608 F.3d at 946. The government must prove the former by a preponderance of the evidence, and the latter by clear and convincing evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

18

While child pornography-related offenses are among the offenses for which the rebuttable presumption of detention applies, that presumption obviously can be rebutted. The presumption thus "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial," a judgment which "represents Congressional findings that certain offenders ... are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." *Stone*, 608 F.3d at 945-46. However, that presumption is not warranted where "special features" exist showing the defendant's case is "outside the congressional paradigm." *Stone*, 608 F.3d at 945 (internal quotation marks omitted). In other words, that what may be true in general with respect to a class of defendants is not true in the particular case of the defendant before the court. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985).

The Bail Reform Act thus neither mandates nor requires pretrial detention in all cases involving offenses for which there is a rebuttable presumption. *See, e.g.*, *United States v. Pece*, No. 1:20-CR-186-1, 2020 WL 6263640, at *7 (S.D. Ohio Oct. 23, 2020) ("Of course, not every child pornography/exploitation case will warrant pretrial detention."). The rebuttable presumption is just that, a presumption that can be rebutted. "Although Congress, in enacting the detention law, permitted defendants charged with certain serious felonies to be detained pending trial, the

detention law does not mandate such detention in every eligible case but, rather, creates a *rebuttable presumption* that such defendants be detained[.]"  *United States v. Crowell*, No. 06-M-1095, et al., 2006 WL 3541736, at *9 (W.D.N.Y. Dec. 7, 2006).

## III.    The Government Did Not Prove by Clear and Convincing Evidence No Condition or Combination of Conditions Will Reasonably Assure the Safety of the Community

Neither the Pretrial Services Officer nor the Magistrate Judge found Mr. Jakits was a danger to the community, much less that no conditions or combination of conditions could reasonably assure the safety of the community.  (Revised Pretrial Services Report, R. 20 Page ID # 47-51; Transcript, R. 29 at Page ID # 101-102 [32:9 – 33:13].)  In fact, this case is unusual, if not altogether unique, in that the defendant's interaction with minors is confined to a single sequence of communications during a brief period of time, involves a small number of photos, and it is disputed whether any of those photos even depict a minor engaged in "sexually explicit conduct" within the meaning of the statute.

In contrast to the kinds of facts presented in other child pornography cases and the kinds of conduct and evidence that experienced law enforcement officials expect to find when investigating such offenses,[2] Mr. Jakits did not possess a library

---

[2] As the lead case agent detailed in his search warrant affidavits, based upon his training and experience investigating individuals who have a sexual interest in children or images of children, such persons typically collect and maintain large

or collection of hundreds or thousands of photos and videos constituting child pornography.  In fact, despite spending more than two years searching (and, in several instances, searching again) a host of devices and accounts associated with Mr. Jakits, the government has presented no evidence Mr. Jakits has ever viewed, searched for or downloaded child pornography on the Internet; that he has been involved in any online child pornography community; or, aside from the communications with Jane Doe #1 in January 2019, that he had ever before, or has ever since, even communicated with any minors.  (*See* Transcript, R. 29, Page ID # 86, 102 [17:8-9, 33:10-13]; Transcript, R. 43, Page ID # 470, 483-484 [42:10-23, 55:3 – 56:1].)

The Magistrate Judge thus readily found "this is a unique case" because there is not "a history" of seeking out minors and the alleged conduct "involving minor victims was perhaps just a situation where the defendant had an opportunity[.]" (Transcript, R. 29, Page ID # 101 [32:9-18].)  The District Court, however, held the government was "not required to go any further than just make the argument that

---

collections of child pornographic material in various formats, download and view such material on the internet, maintain lists of contacts who share the same interests in child pornography, and use various platforms to communicate with minors and receive images.  (Search Warrant Affidavit, R. 37-2, Page ID # 303-307 [¶¶ 5-6].) The government ultimately seized and searched all of Mr. Jakits' phones, computers, and devices; they searched his home; and searched his Apple iCloud accounts.  But the government found none of the myriad things Agent McCabe expected to find based upon his training and experience investigating child pornography offenders.

this criminal conduct was very serious[.]" (Transcript, R. 43, Page ID # 535 [107:3-5].) According to the District Court, the charge itself establishes "the dangerousness to the community." (*Id.* at Page ID # 535 [107:21-23].)

The mere existence of the child pornography charges cannot alone justify pretrial detention. If the charge itself is treated as *ipso facto* clear and convincing proof nothing can be done to reasonably assure the safety of the community, then the rebuttable presumption is instead a mandate. The Bail Reform Act is clear that the presumption it created for certain offense was to be "[s]ubject to rebuttal by the person," 18 U.S.C. § 3142(e)(3), and no case law authority has ever treated it as a mandate. *See, e.g.*, *Pece*, 2020 WL 6263640, at *7; *Crowell*, 2006 WL 3541736, at *9. That the charge is serious is the reason Congress adopted the rebuttable presumption; that same seriousness cannot be relied on as itself conclusively establishing the government has met its evidentiary burden by clear and convincing evidence in a given case.

Nor does the particular nature and circumstances of the charged offenses here suggest present dangerousness. We do not argue that sexual exploitation of a minor in violation of 18 U.S.C. § 2251(a), as charged in Counts 1 through 3 of the indictment, is not a serious charge. It most certainly is. But that is not the question with respect to pretrial detention. The questions in that context are whether the particular case before the court is outside the congressional paradigm for that offense

and whether conditions can reasonably assure the safety of the community. The charges here are based on one discrete sequence of electronic communications four years ago with a teenage girl, and they involve no more than six very much debatable images. There is no evidence of any similar communications, conduct, or images relating to minors—before or since, including in the nearly two years after the alleged incident before Mr. Jakits became aware his conduct was being investigated.

The very case law cited by the government in support of its arguments (*see* Opposition to Motion to Revoke, R. 39, Page ID # 379, 382-383, 392) highlights the degree to which Mr. Jakits' situation differs from the typical child sexual exploitation case, showing very different types of facts presenting a much more immediate, if not imminent danger to the community. For instance, *United States v. Sammons*, No. 2:19-cr-107, 2020 WL 613930 (S.D. Ohio Feb. 10, 2020), involved a defendant who admitted to repeated sexual abuse of a five-year-old female relative for a period of approximately a year (including through the use of sex toys), recorded the abuse, collected and sent "several videos depicting other sexual activity involving children," distributed child pornography online, and had announced to undercover officers his intention to record another video of himself sexually abusing the relative during a sleepover scheduled in a few days' time. *Id.* at *1.

In *United States v. Schenberger*, 498 F. Supp. 2d 738 (D.N.J. 2007), also relied on by the government, the defendant transferred to an undercover officer 799

images and 9 videos portraying "young children participating in sexually explicit poses and/or acts" (13 of which were described as "bondage/dominance pictures involving children"), he was on an instant chat application "buddy list" of another known child pornography offender, he arranged to view via webcam a live molestation of a five-year-old girl, and he was preparing to do so immediately before his arrest. *Id.* at 740.

And in *United States v. Reiner*, 468 F. Supp. 2d 393 (E.D.N.Y. 2006), the defendant, a teacher, possessed "hundreds of images and dozens of videos of children engaged in sexually explicit conduct, including images of sadistic abuse of children" along with 2,000 stories from a website in whose creation he participated which were "devoted to killing, sexually abusing, and eating children. *Id.* at 397. Further, the defendant's emails showed him sharing similar fantasies in numerous messages, including one using a yearbook photo of a specific child from the school where he worked. *Id.*

These and other cases relied on by the government[3] detail the kinds of facts that *can* support a finding by clear and convincing evidence that no conditions will

---

[3] *See also United States v. Blankenship*, No. 1:08-0073, 2008 WL 1925137, at *2 (S.D. W. Va. Apr. 29, 2008) (defendant possessed more than 500 images and videos of child pornography, the videos depicted "severe bondage and torture of children including the hanging of a child from a ceiling and her sexual abuse," he had a history of chatting on the Internet with children giving false descriptions of himself, and he was continuing to actively seek contact with children at the time of his arrest); *United States v. Belcher*, No. 2:12-cr-14, Doc # 11 at 3 (S.D. Ohio Jan. 13, 2012)

reasonably assure the safety of the community from a particular person accused of child pornography offenses.  But none of these kinds of facts are present in this case.

Indeed, the government's own actions demonstrate it does not itself actually view Mr. Jakits as dangerous.  The government became aware of this matter in January 2020 and it executed a series of search warrants in December 2020 and January 2021, yet it did not seek to charge or arrest Mr. Jakits until October 2022.  Instead, the government engaged in a dialogue with defense counsel, provided discovery, and discussed potential resolution of the matter.  All of this occurred without any restrictions or limitations being placed on Mr. Jakits.  The safety of the community was assured by the imposition of no conditions whatsoever.  We do not take issue with the government's course of action in this respect; it was reasonable and appropriate.  But it demonstrates the government itself did not view Mr. Jakits as a danger.  If it had, it would have moved to arrest him much sooner than the *nearly three years* it instead took.

In the District Court's mind, however, dangerousness can be established by the mere fact of the charge itself.  As the District Court put it, comparing the offense to homicide, "say the allegation is he murdered two people.  I find you're a danger

---

(defendant, a Wal-Mart employee, used his phone to surreptitiously record images of a minor boy using the store restroom, he had made two such videos, he possessed many images and videos of other minors on his phone and laptop computer, and had downloaded many others from the Internet using a peer-to-peer file sharing program).

25

to the community, period.  I've never read a case that says that's error because you can't rely on the charge conduct and the presumption alone and that's the end of it." (Transcript, R. 43, Page ID # 504 [76:7-11].)  But this approach simply treats the presumption as a mandate, and refuses to do the work Congress envisioned the courts would do in making fact-specific determinations whether detention was necessary in each individual case.

The District Court was dismissive of the complete lack of evidence in the record of any history, inclination, or proclivity on the part of Mr. Jakits to seek or consume child pornography or to seek out contact of any kind with minors.  In fact, the District Court turned the standard and burden on their heads, speculating as to other hypothetical misconduct or evidence that might not be entirely foreclosed by the evidence in the record and concluding the record "doesn't indicate to the Court … that the dangerousness aspect has been negated."  (Transcript, R. 43, Page ID # 535-536 [107:24 – 108:2].)  But the Bail Reform Act does not require *the defendant* to prove he is not a danger to the community; what the law requires is that *the government* prove that no condition or combination of conditions will reasonably assure the safety of the community, and that it do so *by clear and convincing evidence*.

The government has not done that in this case, as the Pretrial Services Report and the Magistrate Judge both concluded.  The District Court only found danger by

26

concluding there was no need for any evidence of it; the fact of the charge alone would suffice. But that is not the analysis the law requires and, in fact, there is **_no_** evidence Mr. Jakits poses any danger to anyone, much less clear and convincing evidence of any such danger. And the government's own concessions and actions reveal that even they do not see actually him as a danger.

Further, that a defendant poses a danger is not even the end of the analysis. If a district court determines release creates a risk of flight or a danger to the community, "the law still favors pretrial release," *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007), albeit subject to the least restrictive further condition, or combination of conditions, the court determines will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. § 3142(f). Only if the court first concludes no conditions can reasonably assure the safety of the community, is pretrial detention supported. The District Court here did not support its ruling with such an analysis.

## IV.  The Government Did Not Prove by a Preponderance of the Evidence That No Condition or Combination of Conditions Will Reasonably Assure Mr. Jakits' Appearance as Required

Without any analysis of the conditions proposed by Pretrial Services (or any other conditions), the District Court summarily declared Mr. Jakits to be "a risk of flight" based upon "the assets the defendant has, the extensive foreign travel, the age and the mandatory minimum involved in the case[.]" (Transcript, R. 43, Page ID #

536 [108:20-23].)  The District Court's ruling did not address the actual standard, is not supported by the evidence, and is contrary to all of the case law addressing the circumstances under which it can be shown that no conditions or combination of conditions will reasonably assure the appearance of a defendant as required.

### A.  The District Court Only Made One of the Two Findings Required to Justify Pretrial Detention

To support pretrial detention of a defendant as a flight risk, the government must prove not only that a defendant presents "a risk of flight," but further that *no condition or combination of conditions* will reasonably assure the appearance of the defendant as required.  18 U.S.C. § 3142(f).  This is not a matter of semantics.  As one court explained, "*every* case involves some degree of flight risk," but:

> even if there is a risk of nonappearance and/or a risk of danger to the community, detention is only warranted if those risks cannot be sufficiently mitigated by conditions of release.  And, those risks need not be mitigated completely.  A person cannot be detained if there are conditions that would *reasonably assure* their appearance and the safety of the community.  The "reasonably assure" standard reflects that Congress recognized there would be circumstances where, despite conditions of release, a defendant would nevertheless fail to appear as required or would endanger the safety of another.  This standard, no doubt, is intended to minimize the chance that a person will be wrongfully detained.  Given the choice, at the margin, of releasing a dangerous person or detaining a non-dangerous one, Congress chose the former.  The Bail Reform Act of 1984 requires this Court to accept that risk.

*United States v. Runsdorf*, No. 22-8015-WM, 2022 WL 303548 (S.D. Fla. Jan. 24, 2022), at *3-4 (emphasis in original).  Whether a person presents a flight risk, or

even a "serious flight risk," is not the proper standard. *United States v. Gibson*, 384 F. Supp. 3d 955, 964-68 (N.D. Ind. 2019).  The government's burden is two-fold; it must show *both* that the defendant presents a risk of nonappearance *and* that there are no conditions or combination of conditions that will reasonably assure his appearance as required. *Sabhnani*, 493 F.3d at 74-75; *United States v. Godbole*, No. 1:12 CR 381-3, 2012 WL 3686228, at *1 (N.D. Ohio Aug. 24, 2012).

The District Court only addressed the first prong of the dual showing required of the government.  Irrespective of the merits of the District Court's determination that there is "a risk of flight," more than that is required to justify pretrial detention. For example, in *United States v. Godbole*, No. 1:12 CR 381-3, 2012 WL 3686228 (N.D. Ohio Aug. 24, 2012), the court found the defendant "poses a risk of actual flight" by virtue of his status as an alien, his "extensive family ties in India and the means and resources to leave the country," and his past travel to India on multiple occasions, including after receiving a target letter in connection with the government's investigation. *Id.* at *3.  But that was not the end of the story, because the court went on to find that various conditions would reasonably assure his appearance, including the surrender of his passport and home incarceration with electronic monitoring. *Id.* at *3-4; *see also Gibson*, 384 F. Supp. 3d at 966 (holding defendant with record of multiple previous failures to appear and two harrowing instances of fleeing law enforcement after attempted traffic stops presented a

"serious flight risk" sufficient to hold a detention hearing, but government could not prove no conditions could reasonably assurance his appearance in that conditions could assure that, even if he did attempt to flee, it was reasonably likely he would not actually succeed). The District Court did not proceed to the second part of the analysis here and made no findings in that respect.

### B.    The Evidence in the Record Does Not Support the Finding Mr. Jakits Is a Flight Risk

While the District Court did find Mr. Jakits presents "a risk of flight," that determination on the first prong cannot withstand review. In the District Court's own words, that determination was based upon "the assets the defendant has, the extensive foreign travel, the age and the mandatory minimum involved in the case[.]" (Transcript, R. 43, Page ID # 536 [108:20-23].) The case law demonstrates that evidence of this nature, without more, is not sufficient to establish flight risk.

Utilizing the factors set forth in 18 U.S.C. § 3142(g), whether a defendant poses a risk of flight is answered "from a fact-specific examination to determine if there exist conditions or a combination of conditions that would reasonably assure a defendant's appearance at future court proceedings if released." *United States v. Giordano*, 370 F. Supp. 2d 1256, 1263 (S.D. Fla. 2005).

"[I]t is generally accepted that more than evidence of the commission of a serious crime and the fact of a potentially long sentence is required to support a finding of serious risk of flight. A mere theoretical opportunity for flight is not

sufficient grounds for pretrial detention." *Giordano*, 370 F. Supp. 2d at 1264 (citations omitted). For example, in *United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988), the defendant, a computer teacher, faced federal charges of sending and receiving child pornography while also facing state charges for sodomizing and sexually assaulting a number of his male students. *Id.* at 49. The government argued the defendant presented a risk of flight "because of the nature of the charges against him, the strength of the government's case, the long sentence of incarceration he may receive, his age and the obloquy that he faces in his community." *Id.* The district court agreed, but the Second Circuit reversed that decision, specifically holding more is required "than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." *Id.* at 50.

Instead, courts must "take into account whether a defendant has substantial foreign ties, has access to considerable funds to finance flight from the jurisdiction, or has manifested or demonstrated an intent to flee if arrested." *Giordano*, 370 F. Supp. 2d at 1263. Such evidence may include the use of a number of aliases, unstable residential ties to a community, efforts to avoid arrest, or hidden assets. *Id.* at 1264. There is none of this kind of evidence in this case.

Mr. Jakits has no history of failing to appear for court proceedings. He has not sought to evade arrest. He has never been on supervision for anything and has

31

never violated the terms of any release or supervision.  He has made no preparations or given any indication to anyone of any intention to flee.  He has taken no steps to leave any jurisdiction, either after learning of the investigation in December 2020 or learning of the indictment in October 2022.  He has no overseas property, no foreign bank accounts, and no foreign contacts who could aid him in flight.  He has no ties to any place to which he might flee.  He does not have any foreign passport.  He has no skill or experience evading surveillance.  He has never had or used any false identification, immigration or travel documents.  He has never used any aliases.  In short, this case contains *none* of the kinds of evidence that courts rely on when detaining a defendant as a flight risk.[4]

---

[4] *See, e.g.*, *United States v. Williams*, No. 2:20cr-142, 2020 WL 6866404, at *1-2, *5 (S.D. Ohio Nov. 23, 2020) (finding defendant was risk of flight based on 20-year criminal history spanning five states, prior probation violations, failures to appear in court as ordered, and attempts to evade law enforcement); *United States v. Moore*, No. 2:16-cr-170, 2020 WL 2128593 at *2 (S.D. Ohio May 5, 2020) (defendant committed four separate violations of supervised release, engaged in forgery among other criminal conduct, and absconded from state charges and remained at large for five months); *United States v. Baird*, No. 2:10-mj-0431, 2010 WL 2889086, at *3 (S.D. Ohio July 19, 2010) (detaining defendant based in part on risk of flight where he attempted to delete files as officers approached to execute search warrant, acted to delay apprehension, employed camera system allowing him to see officers approaching house, twice refused to come out of his house voluntarily in response to law enforcement requests, and allegedly had made statement describing a plan to flee to Mexico and then Puerto Rico if released).

**C.    Mr. Jakits Has No History of Evasion and He Has Demonstrated His Commitment to Appearing**

Mr. Jakits has no criminal record of consequence, he has no history of missing court appearances or failing to follow court orders, or anything else in his past that would even suggest he would not abide by any conditions imposed by the Court. *See Giordano*, 370 F. Supp. 2d at 1271 ("the lack of any criminal record in this case is certainly a strong factor favoring pretrial release, coupled with the related lack of history in missing court appearances or in failing to follow court orders").

To the contrary, Mr. Jakits has done everything he possibly could have done to demonstrate to the government and the courts his commitment to appearing as required and complying with anything and everything asked of him.  He has known of the strong likelihood of charges against him since December 10, 2020, when he was met by an FBI agent at an airport in Los Angeles and search warrants were executed on his home, devices, and accounts.  Since that time, he has known both of the potential charges against him and the government's intention to pursue those charges.  Yet he has made no attempt to flee.  Instead, he engaged counsel, and cooperated in every way he could *for a period of nearly two years*.  Moreover, when an indictment was returned, he got on a red-eye flight to Columbus and surrendered

himself voluntarily. These are not the actions of a person with any intention of fleeing.

In *Giordano*, the court held that although the defendant's alleged crimes were serious and large sums of money may have been involved, he could not be found a flight risk in the absence of any of the key factors warranting detention on such grounds: "Foremost among them is the absence of any proof or indication that Giordano intends to flee from this indictment. There has been no showing that Giordano would have anywhere to go outside of South Florida to flee, that he has any foreign contacts that could harbor him and help finance his flight, or that he has any history of using aliases or false identification." 370 F. Supp. 2d at 1270; *cf. United States v. Kaplowitz*, No. 14-20323-CR, 2014 WL 2155231, at *5 (S.D. Fla. May 22, 2014) (reversing magistrate's detention order and releasing defendants on bond and other conditions where "both men have never been charged with the commission of crimes, both have ties to partners and extended family members in this community, and neither has any foreign assets or connections to other countries where they might flee to and hide prior to trial" and "neither one has ever used an alias, attempted to avoid arrest, or hidden assets"); *United States v. Garnett*, No. 1:07-CV-00093, 2007 WL 2446585, at *2-3 (S.D. Ohio Aug. 23, 2007) (reversing magistrate judge's detention order and ordering defendant facing drug charges released on conditions, finding rebuttable presumption overcome and that defendant

was not a flight risk where he "has no record of failing to appear for court proceedings," his prior criminal record was more than 10 years old, and he had business interests and family connections in a community).

In fact, even in the face of troubling evidence of past instances of evasion and/or failure to appear (of which there is none in this case), courts have been hesitant to detain defendants as flight risks. In *United States v. White*, No. 3:21-mj-04070, 2021 WL 2155441 (M.D. Tenn. May 27, 2021), the government sought pretrial detention based not only upon the seriousness of the charges and potential penalties and the defendant's demonstrated ability to travel, but also that he was charged with the same kind of offense conduct in another case pending in Oklahoma, had been on pretrial release in that case when he committed the offense conduct that was the subject of the charges in Tennessee, that he had a poor record of compliance with the conditions of pretrial release, that he also was charged with evading arrest in Texas, that he had failed to appear for a court appearance in Georgia, and that he had fled and hid from law enforcement in Oklahoma, and he had numerous arrests in Texas, Georgia and California. *Id.* at *12. The court held that while the government had "shown some risk of flight," this still was not enough even to warrant a detention hearing. *Id.* at *12-14.

There are many other examples of cases in which this court and others have refused to find a defendant to be a flight risk in the face of evidence much stronger

35

than that presented with respect to Mr. Jakits. *See, e.g.*, *United States v. Demmler*, 523 F. Supp. 2d 677, 684 (S.D. Ohio 2007) (finding conditions sufficient to assure appearance of defendant indicted for obstruction and witness tampering despite evidence of foreign money-laundering activity and access to offshore bank accounts, fraudulent credit cards and identification documents, and counterfeit currency); *United States v. Buchanan*, No. 1:21-cr-00293, 2021 WL 1783088, at *5 (N.D. Ohio May 5, 2021) (finding record insufficient to support finding defendant posed a risk of flight based upon his familial ties, his cooperation with authorities upon arrest, and his history of appearances in other proceedings despite that he faced potential mandatory minimum sentence of 20 years and that offense conduct occurred while released on state charges, including text messages apparently sent *as he was leaving his arraignment* in state court).

*United States v. Cammarata*, No. 21-00427-01, 2022 WL 4280480 (E.D. Pa. Sept. 15, 2022), helpfully illustrates what should, and should not, support a finding of flight risk. In that case, the defendant, Mr. Cammarata, was initially released on bail following his arrest despite his access to "seafaring boats, private planes, and offshore assets," including owning an island in the Bahamas and an apartment in Columbia. *Id.* at *2 & *6-7. The government, however, later sought to revoke his bond after Mr. Cammarata purchased a one-way ticket to Bogotá, Columbia, failed to turn in his passport as required by his conditions of release, and smuggled his

girlfriend into the United States, thus committing a felony while on pretrial release. *Id.* The court then ordered pretrial detention based on ***these facts***, *i.e.*, his demonstrated "ability to evade border control and to move a person in and out of the United States by boat, illegally and undetected," and additional evidence of statements by Mr. Cammarata indicating an intent to flee and claiming an "ability to evade border protection between Florida and the Bahamas."

### D.    Mr. Jakits Has Stable Ties to the United States

Mr. Jakits has many stable ties to the United States, including his life partner of 20 years, his daughter, and his two young grandchildren—all living in the Central District of California. Ms. Christensen and his daughter and son-in-law are all ready and willing to support and stand-by Mr. Jakits. In fact, his daughter and son-in-law are willing to put up their own home as security for and/or to finance any bond condition.

Mr. Jakits and his life partner, Ms. Christensen, have been together in a committed relationship for nearly 20 years, living together in the same way that married people do. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶¶ 2, 5, 10, 24]; Transcript, R. 29 at 111-112 [42:3 – 43:13].) Mr. Jakits and Ms. Christensen lived together in Annapolis, Maryland starting in 2003. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶ 5].) Mr. Jakits remained in Annapolis for a period of time following the sale of their business, but later joined Ms.

Christensen in San Luis Obispo, California when the renovations of the home she inherited from her father were completed. (*Id.* ¶ 10.) Mr. Jakits and Ms. Christensen lived together in San Luis Obispo until June 2022. (Revised Pretrial Services Report, R. 20, Page ID # 48; Supp. Declaration of K. Christensen, R. 37-10, Page ID # 359-364 [¶ 7].) Mr. Jakits was and remains committed to the relationship, and Ms. Christensen remains willing for him to return to San Luis Obispo. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶ 24]; Supp. Declaration of K. Christensen, R. 37-10, Page ID # 359-364 [¶ 7].)

Mr. Jakits also has a 37-year-old daughter and two granddaughters (ages two and a half and four months) living less than 200 miles from his and Ms. Christensen's residence in San Luis Obispo. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶¶ 7, 11-12]; Declaration of H. Merrill, R. 37-9, Page ID # 356-257 [¶ 1].) Mr. Jakits and his daughter have a very close relationship, he has always been very involved in her life, they communicate regularly, they have run marathons together, and they have sailed together. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶¶ 7, 11-12]; Declaration of H. Merrill, R. 37-9, Page ID # 356-257 [¶ 2-3, 5].) Mr. Jakits is a loving and committed grandfather to his daughter's two children. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶ 12]; Declaration of H. Merrill, R. 37-9, Page ID # 356-257 [¶ 5].) Despite the charges, Ms. Merrill and her husband would gladly welcome Mr. Jakits to stay with them

38

during the pendency of this matter. (Declaration of H. Merrill, R. 37-9, Page ID # 356-257 [¶ 7].) They are even willing to use their own home as security to guarantee Mr. Jakits' appearance. (Transcript, R. 43, Page ID # 446 [18:4-24].)

Further, Mr. Jakits has many other loving and stable relationships with extended family and friends, including his ex-wife and her current husband, his two brothers, Ms. Christensen's aunt, his son-in-law, and a former client and longtime friend living in California. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶¶ 6, 13-15]; Declaration of H. Merrill, R. 37-9, Page ID # 356-257 [¶ 5].) Before they passed away in the last several years, Mr. Jakits had similar relationships with Ms. Christensen's father and uncle. (Declaration of K. Christensen, R. 37-4, Page ID # 329-333 [¶¶ 14-15].) Indeed, Mr. Jakits has a demonstrated history of building and maintaining long-term personal and business relationships. (*Id.* ¶¶ 11-16.)

There is no evidence—*none*—that Mr. Jakits has any intention of relinquishing any of those extremely-important relationships to avoid this prosecution. He has every intention of doing everything that is asked of him and appearing at trial and defending himself vigorously. In fact, ***everything*** in Mr. Jakits' life and history confirms he is not remotely inclined to flee. If he had any desire to live out his remaining years as a fugitive apart from Ms. Christensen, his daughter and his two granddaughters he had nearly two years in which to leave the

39

United States and find a home elsewhere when there was nothing legally preventing him from doing so.  But those relationships are far more important to him than his freedom; if he was not going to abandon them when he could, he certainly is not going to do it now when he would be legally prohibited from doing so (and subject to GPS monitoring).

> **E.    The Modest Extent of Mr. Jakits' Assets Do Not Present a Flight Risk and Pale in Comparison to Cases Where Flight Risk Has Been Found**

Mr. Jakits' financial resources are not sufficient to finance his living the rest of his life as an international fugitive.  They are not even sufficient to permit him to post the $500,000 surety bond recommended by Pretrial Services without compromising his ability to pay the legal fees required to defend himself.  At any rate, financial resources (even those far in excess of anything comparable to Mr. Jakits) are only evidence of potential means by which one might flee, not an actual risk that a given defendant will do so.

*First*, it is somewhat of a stretch to characterize Mr. Jakits' resources as "significant," especially relative to the question of what he might actually have available to him to finance a hypothetical flight from the United States.  The largest asset by far listed in the Pretrial Services Report is the sailboat (Revised Pretrial Services Report, R. 20, Page ID # 49), which is a 2006 Valiant42 cutter rig sailboat. (Supp. Declaration of K. Christensen, R. 37-10, Page ID # 359-364 [¶ 2].)  The

Pretrial Services Report lists $900,000 as the "Amount" associated with the boat,[5] meaning it comprises the lion's share of the $1,273,000 estimated net worth arrived at in the Report. (Revised Pretrial Services Report, R. 20, Page ID # 49.) But the speculated flight risk was that Mr. Jakits would use that very boat to flee.[6] He could not use the boat both as his means of flight and to finance a life abroad. As such, the actual financial resources available to Mr. Jakits if he wanted to flee are much less.

*Second*, as a practical matter, Mr. Jakits' financial resources do not even permit him to post a $500,000 surety bond, as recommended by Pretrial Services. He and Ms. Christensen are attempting to sell the boat, but the winter is not a conducive time to selling a sailboat. Even if they are able to sell the boat though, Mr. Jakits' half of the proceeds will not allow for that kind of a bond. Going through

---

[5] We note that $900,000 was the approximate purchase price for the boat in 2008, not its current value. The boat is currently listed for sale at a price of $399,000. Further, the owner of the boat is RogueWave Yachts Sales and Service LLC, the company jointly owned by Mr. Jakits and Ms. Christensen as 50/50 partners. (Supp. Declaration of K. Christensen, R. 37-10, Page ID # 359-364 [¶ 2].) As such, technically only one half of the boat belongs to Mr. Jakits.

[6] While the government had argued, and the Magistrate Judge had agreed, that Mr. Jakits' ownership interest in a boat and his sailing experience were central components of the alleged flight risk he presented, the District Court dismissed the boat as "a little bit of a red herring" (Transcript, R. 43, Page ID # 507 [79:6-8]) and the District Court did not base its decision on any of this. The District Court was correct in this regard. As detailed at length in Mr. Jakits' Motion to Revoke, the case law gives no particular significance to ownership of or access to a boat and, in any event, conditions can easily place Mr. Jakits' boat beyond his reach. (*See* Motion to Revoke, R. 37, Page ID # 265-269.)

a bail bondsman likely means coming up with at least 10 percent of the amount.  Mr. Jakits does not have the kind of cash needed to pay a $50,000 non-refundable premium to a bondsman and still be able to afford to pay his legal fees.

*Third*, and in any event, "[m]erely having access to significant funds is not enough[.]" *Giordano*, 370 F. Supp. 2d at 1264.  As the court explained in *Giordano*, a defendants' ties to the community and the absence of a criminal record outweigh a showing he has financial resources with which to flee: "He is an American citizen, has substantial properties in this community, and has substantial family ties here and elsewhere in the country that would all compel him to appear in Court and defend himself against these charges."  370 F. Supp. 2d at 1271 (releasing defendant on bond and conditions despite defendant's access to at least $800,000 in cash, his failure to disclose all of his asset to pretrial services officer, and possible access to offshore accounts because "there is no evidence proffered from the Government that he has any substantial ties to any other country through which he could flee the jurisdiction").

For example, in *United States v. Runsdorf*, No. 22-8015-WM, 2022 WL 303548 (S.D. Fla. Jan. 24, 2022), the government sought pretrial detention of a defendant charged with being the "leader of a large-scale conspiracy to sell mismarked pharmaceuticals and with laundering the proceeds of that crime," which exceeded $50 million.  2022 WL 303548, at *3.  In its initial attempt to have Mr.

Runsdorf detained, the government's proffered evidence of his risk of flight was (1) the potential length of his sentence if convicted, (2) the weight of the evidence, (3) his financial resources (which included a substantial amount of assets, two homes, multiple luxury vehicles, motor vessels, and three companies), (4) his control over a boat moored in St. Maarten, Virgin Islands, and (5) his history of international travel. *Id.* at *4.

The court held that such evidence did not establish "a serious risk" that Mr. Runsdorf would flee sufficient to even entitle the government to a detention hearing under 18 U.S.C. § 3142(f)(2)(A),[7] 2022 WL 303548 at *4, and that it came nowhere close to showing by a preponderance of the evidence that there were no conditions sufficient to reasonably assure Mr. Runsdorf's appearance. *Id.* at *4-6. The court acknowledged that the nature of the charges, the potential penalties and the weight of the evidence "all provide a motive to not appear" and that Mr. Runsdorf's substantial financial resources gave him the ability to do so and "allow him to live 'on the run[.]'" *Id.* at *5. But motive and ability were not enough where a $1 million

---

[7] *Runsdorf* did not involve a charged offense that triggered the mandatory presumption or otherwise automatically entitled the government to a detention hearing, thus to get the court *to even consider* pretrial detention the government had to meet the threshold, and lesser, hurdle of demonstrating the defendant presented a "serious risk" of flight. The instant case involves a different procedural context, but *Runsdorf* is nevertheless instructive because the court there was presented with much stronger evidence of flight risk than the government has mustered with respect to Mr. Jakits, yet the *Runsdorf* court held even that was not enough to warrant a hearing, much less a detention order. 2022 WL 303548 at *4-6.

bond secured by his two homes, GPS monitoring, a prohibition on visiting "commercial transportation establishments," and his ties to his spouse, siblings, children and a dependent elderly parent were sufficient impediments and disincentives to flee.  *Id.*[8]

### F.    Mr. Jakits' Past International Travel Is Not of the Type that Would Aid Flight of Any Kind

It is true that Mr. Jakits has traveled extensively in his 71 years.  But a history of experience with international travel is not sufficient to justify pretrial detention as a flight risk without some other indication of an actual intention to flee or some contacts or assets abroad that could assist in such an endeavor.  *See White*, 2021 WL 2155441, at *14 (ability to travel alone "is not very probative of whether [a defendant] would choose to travel specifically in order to avoid appearing in court"); *Giordano*, 370 F. Supp. 2d at 1271-72 (denying motion to detain despite defendant's access to significant resources with which to finance flight, his extensive travel in foreign countries, and his family connections in Italy); *Runsdorf*, 2022 WL 303548,

---

[8] Mr. Runsdorf ultimately was later detained by a Texas district court after a DEA agent testified a confidential source had reported Mr. Runsdorf had claimed he "was about to travel from Boca Raton to the island of St. Marteen" using his 110-foot superyacht under circumstances giving rise to the understanding that he intended to flee.  *United States v. Runsdorf*, No. 22-40073, 2022 WL 1198205 (5th Cir. Apr. 22, 2022) (affirming eventual detention by Texas district court).  This further illustrates the kind of additional information beyond mere motive and opportunity that is required to warrant detention as a flight risk.

at *4-6 (refusing to detain defendant despite, *inter alia*, history of international travel).

International travel, in fact, is neither difficult nor complicated. All it requires is a passport and enough money to buy a plane ticket. No specialized knowledge is needed, nor is any ability to operate secretively. Mr. Jakits has traveled internationally, but with a passport through standard channels of international travel. If released on the conditions proposed by Pretrial Services, Mr. Jakits could not even attempt to travel in that fashion. He would have to acquire false immigration documents or figure out some way to travel internationally without a passport or any documentation. And do so without alerting Pretrial Services by setting of his GPS monitoring.

Mr. Jakits has no experience traveling without a passport or evading border patrol and customs processes. He has no experience entering or leaving countries secretively or illegally. He does not own any foreign property. He has no foreign assets or accounts. He has no foreign contacts to assist him. He has no where to go, and no way to support himself even if he could get there.

While Mr. Jakits has travelled internationally, he has none of the kind of experience, contacts, or assets that evidence a potential flight risk.

## **CONCLUSION**

For all of the reasons set forth above, Defendant-Appellant Bernhard Jakits respectfully requests that the Court reverse the District Court's Order denying his Motion to Revoke Detention Order and order his release, subject to conditions, pending his trial.

Respectfully submitted,

*/s/ Tillman J. Finley*
Tillman J. Finley
Daniel Marino
MARINO FINLEY LLP
818 Connecticut Avenue, N.W., Suite 801
Washington, DC  20006
(202) 223-8888

David H. Thomas
TAFT STETTINIUS & HOLLISTER LLP
41 South High Street, Suite 1800
Columbus, OH  43215-6106
(614) 221-2838

*Counsel for Appellant*

46

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Sixth Circuit Rule 32, the undersigned certifies that this Brief of Appellant, excepting the items excluded by Rule 32(f), contains 12,997 words, as counted by Microsoft Word.

*/s/ Tillman J. Finley*_____

Tillman J. Finley
Daniel Marino
MARINO FINLEY LLP
818 Connecticut Avenue, N.W., Suite 801
Washington, DC  20006
(202) 223-8888

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing has been served on January 13, 2023, by filing same via the CM/ECF system, which will send electronic notice to counsel of record.

*/s/ Tillman J. Finley*_____

Tillman J. Finley
Daniel Marino
MARINO FINLEY LLP
818 Connecticut Avenue, N.W., Suite 801
Washington, DC  20006
(202) 223-8888

# ADDENDUM:

## Designation of Relevant District Court Documents
## Contained in Electronic Record

| Record Entry No. | Description | Page ID# Range |
|---|---|---|
| 3 | Indictment | 3-8 |
| 20 | Revised Pretrial Services Report | 47-51 |
| 25 | Defendant's Submission Regarding Evaluation of Weight of the Evidence Pursuant to 18 U.S.C. § 3142(g)(2) | 54-58 |
| 27 | Order of Detention Pending Trial | 66-68 |
| 29 | Transcript of Detention Hearing (October 19 and 21, 2022 | 70-128 |
| 37 | Defendant's Motion to Revoke Detention Order (and exhibits thereto) | 224-370 |
| 39 | Government's Opposition to Defendant's Motion to Revoke Detention Order (and exhibits thereto) | 372-424 |
| 41 | Order Denying Motion to Revoke Detention Order | 426 |
| 42 | Notice of Appeal | 427-428 |
| 43 | Transcript of Hearing (January 5, 2023) | 429-540 |